**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LATARA DURAND, individually,

     Plaintiff,

v.

MICHELLE BARNES, EXECUTIVE DIRECTOR, COLORADO DEPARTMENT OF
HUMAN SERVICES, in her official capacity;

ANDERS JACOBSON, DIRECTOR, COLORADO DIVISION OF YOUTH SERVICES,
in his official capacity;

ERIK JULIUS, DIRECTOR, LOOKOUT MOUNTAIN YOUTH SERVICES CENTER
in his official capacity;

MARI SHULL, individually;

JEREMY EBERSBACH, individually;

     Defendants.

---

**COMPLAINT WITH JURY DEMAND**

---

     COMES NOW, the Plaintiff, Latara Durand, by and through her attorneys, Thomas

H. Mitchiner of Mitchiner Law, LLC, and Steven Murray of Murray Law, LLC, to submit

her Complaint with Jury Demand against the following Defendants: (1)  Michelle Barnes,

Executive Director, Colorado Department of Human Services, in her official capacity; (2)

Anders Jacobson, Director, Colorado Division of Youth Services, in his official capacity;

(3) Erik Julius, Director, Lookout Mountain Youth Services Center, in his official capacity;

(4) Mari Shull, in her individual capacity; and (5) Jeremy Ebersbach, in his individual capacity.

## NATURE OF THE CASE

Latara Durand [Durand] is a Black female. She is a former employee at Lookout Mountain Youth Services Center [Lookout Mountain], a Colorado juvenile criminal correctional facility. During Durand's employment at the Lookout Mountain facility, she was the victim of a violent physical attack by a male inmate while she was performing guard duties.

Upon Durand's return to work after the attack, the male inmate threatened to kill her and to continue to assault her physically. The inmate communicated this threat to Durand's co-workers. Moreover, the male inmate made several intimidating and threatening physical gestures to Durand.

Lookout Mountain did not protect Durand after the violent attack.

Lookout Mountain caused Durand to suffer severe and continuing economic losses and professional harm, emotional pain and suffering, mental anguish, fear for her safety, loss of enjoyment of life, humiliation, and embarrassment, and physical pain and suffering.

Durand asserts claims for (1) racially discriminatory treatment in the terms and conditions of her employment, including but not limited to work assignments, transfer, and promotion opportunities; (2) a hostile work environment based on race; and (3) a violation of the policies of Lookout Mountain, and/or the Colorado Division of Youth

Services, and/or the Colorado Department of Human Services, prohibiting race discrimination in employment.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. Sections 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

2.      This Court has supplemental jurisdiction over Durand's state law claims pursuant to 28 U.S.C. § 1367.

3.      The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

4.      Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

5.      Plaintiff Durand is a Black female, thirty-one years of age.

6.      Durand is a resident of the City and County of Denver, State of Colorado.

7.      Defendant, Michelle Barnes, Executive Director, Colorado Department of Human Services [Department], is a defendant in her official capacity.

8.      The Department of Human Services is an agency of the State of Colorado. Suit is brought against Barnes/the Department in its official capacity for prospective injunctive and equitable relief.

9.      Anders Jacobson, Director, Colorado Division of Youth Services [DYS], is a defendant in his official capacity.

10.     DYS is an agency/division/entity of the State of Colorado. Suit is brought against Jacobson/DYS in its official capacity for prospective injunctive and equitable relief

11.     Erik Julius, Director, Lookout Mountain Youth Services Center [Center], is a defendant in his official capacity.

12.     The Center is an agency/division/entity of the State of Colorado. Suit is brought against Julius/the Center in its official capacity for prospective injunctive and equitable relief

13.     Except where specifically designated, Defendants Barnes/the Department, Jacobson/DYS, and Julius/Center are collectively referenced herein as "Lookout Mountain" and/or the "Lookout Mountain Defendants."

14.     Defendant Mari Shull is a resident of and domiciled in the State of Colorado. At all times relevant to this Complaint, she was employed by the Lookout Mountain Defendants as the Assistant Director of Lookout Mountain. Suit is brought against Shull in her individual capacity for monetary relief.

15.     Defendant Shull was involved in the day-to-day operations of Lookout Mountain and had direct responsibility for the supervision of Durand.

16.     Defendant Shull, as Assistant Director, was in a position to help Durand avoid the harm and discrimination she suffered during her employment, and Shull did not act to prevent the harm and discrimination to Durand. Shull exercised direct control,

supervision, and policymaking, decision-making authority concerning the adverse employment actions which harmed Durand.

17.     Upon information and belief, Defendant Jeremy Ebersbach is a resident of and domiciled in the State of Colorado. At all times relevant to this Complaint, Ebersbach was employed by the Lookout Mountain Defendants as an Interim Unit Manager at Lookout Mountain. Suit is brought against Ebersbach in his individual capacity for monetary relief.

18.     Defendant Ebersbach was involved in the day-to-day operations of Lookout Mountain and had direct responsibility for the supervision of Durand.

19.     Defendant Ebersbach, as Interim Unit Manager, was in a position to help Durand avoid the harm and discrimination she suffered during her employment and Ebersbach did not act to prevent the harm and discrimination to Durand. Ebersbach exercised direct control, supervision, and policymaking, decision-making authority concerning the adverse employment actions which harmed Durand.

## BACKGROUND

20.     Durand began working for Lookout Mountain in March 2012.

21.     Durand was constructively discharged from Lookout Mountain on or about July 24, 2017.

22.     At the time of her separation from employment, Durand held the position of Youth Services Specialist II.

23.     Durand supervised employees serving in the Youth Services Specialist I position.

24.     Durand supervised approximately five to fifteen staff members depending the day of the week.

25.     In addition to supervising other Lookout Mountain employees, Durand was also responsible for ensuring that the unit was safe and secure for staff and inmates.

26.     Throughout her time working for Lookout Mountain, Durand received positive performance reviews and received no severe discipline.

27.     Lookout Mountain is an intensive secure treatment facility for approximately 140 male juvenile offenders. The inmates occupy four housing units.

28.     Durand worked in the Spruce Unit. The Spruce unit housed about 40 juveniles. The Spruce Unit was one of four housing units at Lookout Mountain.

29.     Lookout Mountain is designed to meet the needs of the Division of Youth Services' [DYS] highest risk youth and accepts referrals from all four of the DYS's management regions.

30.     Lookout Mountain utilizes a multi-disciplinary team [MDT] approach. The MDT process provides a structured setting for the development of individualized treatment plans, treatment plan review, and case related decision-making. Whenever there is an issue with an inmate, the MDT meets and discusses how to best handle the problem to protect the inmate, other inmates, and staff.

31.     Defendant Shull was an Assistant Director at Lookout Mountain. Shull had supervisory control over Durand.

32.     Defendant Ebersbach was an Interim Unit Manager at Lookout Mountain. Ebersbach was Durand's direct supervisor, and he had supervisory control over Durand.

33.     Brian Davis [Davis], a White male, and Kirsten Gonzalez [Gonzalez] were Behavioral Health Specialists at Lookout Mountain.

34.     Davis and Gonzalez worked with inmates assigned to Durand

## GENERAL ALLEGATIONS

### A.     *Attack on Durand by Inmate*

35.     On or about May 22, 2017, an inmate named John Doe [Doe][1], a male inmate in Durand's unit, physically assaulted her.

36.     At the time of the attack, Doe was fifteen years of age.

37.     Doe was physically larger and stronger than Durand.

38.     Durand is five-feet tall.   At the time of the incident, she weighed approximately 140 pounds.

39.     She estimates that Doe is five feet, ten inches tall, and weighed 230 pounds.

40.     On the day in issue, Doe engaged in two physical confrontations [fights] with male inmates.

41.     Durand, at approximately 3:00 p.m., witnessed the second fight, in which Doe was fighting with an inmate who was much smaller than Doe. She intervened and stopped the fight.

42.     Subsequently, at around 7:00 p.m., Durand noticed that Doe was not following his program, i.e., failing to use proper conduct procedures designed for him by the MDT, concerning how he was sitting on a chair and the direction he was facing.

43.     Durand instructed Doe to follow his program, but Doe refused.

---

[1] John Doe is a pseudonym.

44.     Because of Doe's refusal to follow Durand's instructions, Durand informed him that he would have to go to his room.

45.     At approximately 7:05 p.m., Durand walked Doe to his room and began to unlock the door. As she was unlocking the door, Doe attacked her from behind, hitting her in the back of the head, and knocking her to the floor.

46.     Durand's injuries were severe. She was treated in the Emergency Department at St. Anthony's Hospital in Lakewood, where she diagnosed as suffering a Grade II Concussion and other neck injuries.

47.     The next day, May 23, 2017, Durand was treated by physicians at the Concentra Urgent Care medical facility, where her diagnosis was confirmed.

48.     Durand's medical providers advised her to take one week off work and after that, return to work on modified duty.

**B.     Durand's Return to Work**

49.     At Lookout Mountain, each unit has a control desk. The control desk maintains the traffic in the unit, acting as a hub for direction and control of the inmates.

50.     Upon Durand's return to work, her modified duties required her to: (1) work at the control desk; (2) have a staff member present every time inmates were around her; and (3) never be alone with Doe.

51.     After the incident, Doe's MDT met to discuss how to handle the new issues. Doe's MDT consisted of Brian Davis, Doe's Behavioral Specialist, Ebersbach, Durand's supervisor, and Shull, an Assistant Director.

52.     The MDT placed Doe on a new Special Management Plan, requiring him to stay away from other inmates.

53.     The MDT did not take any steps to protect Durand from Doe while she was working.

54.     When Durand was performing her modified duties as the control desk staff member, she was required to check on all inmates secured in their rooms every fifteen minutes.

55.     Accordingly, Durand was required to check on Doe every fifteen minutes. On each occasion, Doe would stand at the window and glare at her. Ms. Durand found Doe's conduct to be intimidating and threatening.

56.     Because of Doe's behavior, Durand was forced to ask other staff members to perform the room check duty for Doe.

**C.      Inmate's Threat on Durand's Life**

57.     Doe threatened to kill Ms. Durand.

58.     After Durand's return to work in modified duty status and her assignment to the control desk, Doe, in a meeting with Davis, Doe's counselor, that was overheard by Gonzalez, a counselor who shared an office with Davis, asked if Ms. Durand was "pressing charges against him."

59.     Doe stated that he would continue to assault Durand and he would kill her if she pressed charges against her.

60.     Davis did not report this information to management, nor did he create a Safety Plan to protect Durand from Doe.

61.     Gonzalez, upon hearing Doe's threat, approached Durand at the control desk and asked her to go to a room. The room had glass doors.  Through the doors, Durand observed Davis and Doe walking through the control room at Spruce, and Doe was glaring at her with clenched fists.

62.     At this time, Gonzalez informed Durand that she had heard Doe, in talking with Davis about Durand pressing charges against him, state that he would kill Durand if she pressed charges against him.

### D.     Ms. Durand's Futile Requests for Help

63.     Durand acted in a good-faith and professional manner in reaching out to Ebersbach, her supervisor, and Shull, an Assistant Director, in seeking to move forward after the attack.

64.     Durand found Ebersbach and Shull to be indifferent and mean-spirited in responding to her concerns and reasonable requests regarding her safety in the workplace.

65.     Durand, upon learning of Doe's threat to her life, reported the threat to Ebersbach, her direct supervisor.

66.     Durand requested Shull and Ebersbach to transfer her from Doe's unit.

67.     Shull and Ebersbach refused to transfer Doe.

68.     Durand regularly and repeatedly asked Ebersbach and Shull to schedule her so that she did not have to work with Doe, and each time they refused to help her.

69.     Durand requested Ebersbach to protect her from Doe. In response, Ebersbach did not act to protect Doe, stating: "there is nothing I can do."

70.     Ebersbach directed Durand to speak with Shull, an Assistant Director.

71.     Durand met with Shull.

72.     Shull informed Durand that: (1) she would not move Doe out of the Unit where Durand was working; (2) she would not transfer Doe from the unit where Durand was working; and (3) neither Shull nor Lookout Mountain would call the police concerning Doe's threats to continue to assault Durand and to kill Durand.

73.     Schull did not offer/propose taking any steps to protect Durand.

74.     In contrast to the way Lookout Mountain treated Durand, Lookout Mountain protected a similarly situated, White female guard, serving as a Youth Services Specialist II, the same job held by Durand.

75.     An inmate had assaulted the White female. Lookout Mountain moved the inmate away from the White female's unit, as she requested.

76.     Lookout Mountain did not provide Durand the same treatment as provided to the White female guard.

**E.     Durand's Separation from Employment**

77.     After the incident, Durand contacted the Jefferson County District Attorney's Office [District Attorney] to initiate action against Doe for her protection. Doe has cooperated with the District Attorney concerning all proceedings.

78.     For the last three months of her tenure with Lookout Mountain, Durand continued to suffer from physical injuries, anxiety, post-traumatic stress disorder, and panic attacks. These conditions/symptoms forced her to leave work early on many occasions.

79.     During the last three weeks of Durand's employment, in discussions with Schull, after Schull and Ebersbach, refused to transfer Doe, Durand raised the issue of applying for a promotion to Youth Services Specialist III. In this position, Durand would have campus-wide duties and work the graveyard shift, approximately 10:00 p.m. to 8:00 a.m.

80.     In the discussion concerning Durand's potential application for a promotion, Schull did not guarantee or encourage Ms. Durand to apply; however, she stated that the assaults on guards working the graveyard shift were more severe/egregious than non-graveyard shifts. At this point, Durand began sobbing.

81.     A few days later, Ms. Durand submitted her resignation and two-week notice.

82.     After enduring three months of this intolerable treatment, Ms. Durand was constructively discharged from employment in July of 2017.

83.     As a direct and proximate result of the Defendants' conduct, Durand has suffered severe and continuing economic losses and professional harm, emotional pain and suffering, mental anguish, fear for her safety, loss of enjoyment of life, humiliation, and embarrassment, and physical pain and suffering.

## CLAIMS FOR RELIEF

### First Claim

**[Race Discrimination -  Disparate Treatment]**
**[42 U.S.C. Section 1983 and 42 U.S.C. Section 1981]**

(Against Defendants Shull and Ebersbach in their individual capacities,
and the Lookout Mountain Defendants, in their official capacities)

84.    Durand hereby incorporates all allegations contained in this Complaint as though fully set forth herein.

85.    This claim is brought against Defendants Shull and Ebersbach, in their individual capacities, seeking monetary relief.

86.    This claim is brought against the Lookout Mountain Defendants, in their official capacities, seeking prospective injunctive relief and equitable relief.

87.    Defendants Shull and Ebersbach, acting in their individual capacities, are "persons" under 42 U.S.C. § 1983.

88.    The Lookout Mountain Defendants, acting in their official capacities, are "persons" for purposes of prospective injunctive relief under 42 U.S.C. § 1983.

89.    Defendants were always acting under color of state law.

90.    Title 42 U.S.C. § 1983 ("Section 1983") is the jurisdictional vehicle appropriate to obtain relief against a state actor for a violation of 42 U.S.C. § 1981 ("Section 1981")

91.    Also, Section 1983 is the jurisdictional vehicle appropriate to obtain relief against a state actor for a violation of the Equal Protection Clause of the Fourteenth Amendment of the United Constitution.

92.    The Lookout Mountain Defendants and Shull and Ebersbach: (1) deprived Durand of her federal right to be free from race discrimination in employment as guaranteed by Section 1981 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; and (2) are persons acting under color of state law.

93.     Section 1981 prohibits race discrimination in employment, in securing that all persons: (1) the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens; (2) the enjoyment of all benefits, privileges, terms and conditions of the employment relationship; and (3) the rights protected by Section 1981 are protected against  impairment under color of state law.

94.     Durand, a Black female, is a member of a protected class under Section 1981 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

95.     Durand was qualified and satisfactorily performing her job.

96.     Durand was subjected to racial discrimination in the terms and conditions of her employment, including but limited to: (1) Defendants refusal to protect Durand from Doe; (2) denying Durand's requests to be transferred out of Doe's unit; (3) refusing to transfer Doe from Durand's unit; (4) refusing to call the police concerning Doe's threats to continue to assault Durand and to kill Durand; (5) effectively denying her the right to apply for a promotion; (6) creating and maintaining a hostile work environment based on race and failing to remedy the environment; and (7) creating and maintaining intolerable conditions for Durand's employment resulting in her involuntary separation from employment.

97.     Defendants discriminatory actions against Durand were taken under circumstances giving rise to an inference of discrimination.

98.    Defendants denied Durand: (1) the protections against race discrimination provided by Section 1981 in the terms and conditions of her employment; and (2) her constitutionally protected rights, under the Equal Protection Clause of the Fourteenth Amendment,  when they intentionally and recklessly acted to deny her equal protection under the law based upon race.

99.    Durand's race was a motivating factor for Defendants' actions.

100.    Defendants Shull and Ebersbach intentionally discriminated against Durand because of her race.

101.    Defendants Shull and Ebersbach are not entitled to qualified immunity for the complained of conduct.

102.    Defendants Shull and Ebersbach intentionally discriminated against Durand because of her race, depriving Durand of an actual constitutional and statutory right, the right to be free from race discrimination in employment guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and by Section 1981.

103.    Durand's right to be free from racial discrimination, including the right to be free from a hostile work environment based on race, was clearly established at the time of the Shul'sl and Ebersbach's actions against Durand. The conduct by Shull and Ebersbach violated clearly established rights belonging to Durand of which a reasonable person in Shull's and Ebersbach's positions knew or should have known.

104.    The Defendants engaged in race discrimination against Durand pursuant to its custom, policy, or practice to engage in race discrimination in employment.

105.    Defendants' conduct was willful, wanton and in reckless disregard of Durand's federally protected rights, and was the proximate cause of significant injuries, damages, and losses that she incurred.

106.    Defendants' treatment of Durand constitutes: (1) intentional, unlawful, racial discrimination guaranteed by 42 U.S.C. § 1981, as asserted through the jurisdictional vehicle of 42 U.S.C. § 1983; and (2) intentional, unlawful, racial discrimination guaranteed by under the Equal Protection Clause of the Fourteenth Amendment, as asserted through the jurisdictional vehicle of 42 U.S.C. § 1983.

## Second Claim

### [Race Discrimination - Hostile Work Environment]
### 42 U.S.C. Section 1983 and 42 U.S.C. Section 1981]

(Against Defendants Shull and Ebersbach in their individual capacities,
and the Lookout Mountain Defendants, in their official capacities)

107.    Durand hereby incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

108.    This claim is brought against Defendants Shull and Ebersbach, in their individual capacities, seeking monetary relief.

109.    This claim is brought against the Lookout Mountain Defendants, in their official capacities, seeking prospective injunctive relief and equitable relief.

110.    Section 1981 prohibits racial discrimination in the form of a hostile work environment based on race.

111.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits racial discrimination in the form of a hostile work environment, based on race.

112.   Defendants in consideration of all the facts, in a cumulative manner, intentionally created, tolerated, and perpetuated a hostile and abusive work environment, based upon race, against Durand.

113.   Defendants conduct directed at Durand subjected her to materially adverse conduct, which was unwelcome and offensive.

114.   Defendants conduct directed at Durand subjected her to materially adverse conduct which was sufficiently severe and/or pervasive as to alter the terms, conditions adversely, and privileges of Durand 's employment;

115.   Defendants conduct directed at Durand  subjected her to materially adverse conduct which created an abusive working environment for Durand, including but not limited to: (1) Defendants refusal to protect Durand from Doe; (2) denying Durand's requests to be transferred out of Doe's unit; (3) refusing to transfer Doe from Durand's unit; (4) refusing to call the police concerning Doe's threats to continue to assault Durand and to kill Durand; (5) effectively denying her the right to apply for a promotion; (6) creating and maintaining a hostile work environment based on race and failing to remedy the environment; and (7) creating and maintaining intolerable conditions for her employment resulting in her involuntary separation from employment.

116.    Defendants conduct directed at Durand subjected her to materially adverse conduct. Which created an abusive working environment, was racial in nature, and/or specifically and solely directed at Durand, because of her protected class.

117.    Defendants are liable for subjecting Durand to the racially hostile work environment.

118.    Defendants Shull and Ebersbach were Durand 's supervisors. As described herein, Shull and Ebersbach engaged in creating and maintaining the hostile work environment. The hostile work environment resulted in Durand's adverse tangible employment action, involuntary separation from employment in the form of constructive discharge.

119.    In addition to, or in the alternative to the contention in the above paragraph, Defendants are liable for subjecting Durand to the racially hostile work environment claim because Shull and Ebersbach engaged in creating and maintaining the hostile work environment, as described above, and the action did not result in a tangible employment action.

120.    In addition to, or in the alternative to  the contentions in the above two paragraphs, Defendants are liable for subjecting Durand  to the racially hostile work environment claim because Durand  was subjected  to racial harassment by co-workers, supervisors, and third parties (Doe), and Durand's supervisors and managers knew or should have known of all the materially adverse conduct in issue.

121.    Defendants failed to: (1) stop the materially adverse conduct in issue; and (2) implement reasonably  prompt and appropriate corrective action.

122.     Each successive episode of Defendants' cumulative conduct against Durand, constituting the hostile work environment, had its predecessors, and the impact of the separate incidents accumulated such that the unlawful work environment created, exceeded the sum of any individual episode.

123.     Defendants' treatment of Durand constitutes: (1) intentional, unlawful, racial discrimination, in the form of a hostile work environment based on race, as guaranteed by 42 U.S.C. §1981, as asserted through the jurisdictional vehicle of 42 U.S.C. § 1983; and (2) intentional, unlawful, racial discrimination, in the form of a hostile work environment based on race,  guaranteed by under the Equal Protection Clause of the Fourteenth Amendment, as asserted through the jurisdictional vehicle of 42 U.S.C. Section 1983.

<u>**Third Claim**</u>

**[Breach of Contract]**

(Against the Lookout Mountain Defendants, in their official capacities)

124.     Durand hereby incorporates and restates all allegations previously asserted in this Complaint as though fully incorporated herein.

125.     This claim is brought against the Lookout Mountain Defendants, in their official capacities.

126.     In the course of Durand's employment with the Lookout Mountain Defendants, Durand was advised and/or trained and/or became aware of employment policies prohibiting race discrimination in her employment.

127.   Ms. Durand understood that all employees of the Lookout Mountain Defendants were entitled to receive the protections of these policies.

128.   These policies constituted a contract between the Lookout Mountain Defendants and Durand.

129.   The Lookout Mountain Defendants' conduct, described in the above paragraphs of this Complaint, breached the contract, established by the policies against race discrimination.

130.   Durand has suffered economic and non-economic damages as a direct and proximate result of the conduct of the Lookout Mountain Defendants.

## JURY TRIAL REQUEST

Pursuant to Fed. R. Civ. P. 38 (a) (b) (c), all applicable laws providing for a right to trial by jury, Durand seeks a jury trial of all claims and issues in this action.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, Latara Durand, respectfully prays for a judgment to be entered against the Defendants as follows:

A.      Against (1) Michelle Barnes, Executive Director, Colorado Department of Human Services, in her official capacity; (2) Anders Jacobson, Director, Colorado Division of Youth Services, in his official capacity; (3) Erik Julius, Director, Lookout Mountain Youth Services Center, in his official capacity; for declaratory relief, prospective injunctive relief and equitable relief, including but not limited to possible reinstatement and front pay, and for actual and compensatory damages for the breach of contract claim;

B.     Against Mari Shull, in her individual capacity; and Jeremy Ebersbach, in his individual capacity, for actual economic damages as established at trial and as permissible under the Eleventh Amendment;

C.     Against Mari Shull, in her individual capacity; and Jeremy Ebersbach, in his individual capacity, for compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

D.     Against Mari Shull, in her individual capacity; and Jeremy Ebersbach, in his individual capacity, for punitive damages against for all claims as allowed by law in an amount to be determined at trial.  Pre-judgment and post-judgment interest at the highest lawful rate;

E.     Attorney Fees and Costs;

F.     All other legal and equitable relief as the Court deems proper.

Respectfully submitted this 21 May 2019.

Mitchiner Law, LLC
By:

/s/ Thomas H. Mitchiner
Thomas H. Mitchiner
Mitchiner Law, LLC
1888 N. Sherman St., Ste 200
Denver, CO 80203
Phone: 720-538-0371
E-mail:
tmitchiner@mitchinerlawllc.com
Attorney for Plaintiff Latara Durand

Murray Law, LLC
By:

/s/ Steven Murray
Steven Murray
Mitchiner Law, LLC
1888 N. Sherman St., Ste 200
Denver, CO 80203
Phone: 720-600-6642
E-mail:
steven@smurraylaw.com
Attorney for Plaintiff Latara Durand